UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) No. 09 CR 540-5 |
| v. | ) |
| | ) Hon. Samuel Der-Yeghiayan |
| MICHELLE PARKER | ) |

## Government's Response to Defendant Michelle Parker's Objections to the PSR, and to her Sentencing Memorandum

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, the United States Attorney for the Northern District of Illinois, responds to defendant Michelle Parker's sentencing papers as follows.

## I. Introduction

Defendant Michelle Parker was employed as an assistant loan officer at M&R Mortgage Solutions during the time period charged in the indictment. In that role, the defendant directly caused the processing of each of the fraudulent loans described in the PSR, she played a significant role in the scheme charged in the indictment, and she received specific payments for participating in specific aspects of the fraud. Although she presents some credible mitigation arguments in her sentencing papers, her claim that, "she could not fathom standing up to her male co-defendants and resisting their invitation to break the law" should be discredited. She was not a victim in this case – she victimized others.

The government agrees with the sentencing guideline calculations contained in the PSR. As explained in detail in its August 12, 2010, pleading, the government

calculates the total loss amount as **$2,037,208.53**, which is within the range contained on page 7 of the PSR, and calculates restitution due in the amount of **$1,001,687.66** (see table on page 15). As discussed below, the defendant employs a faulty methodology to compute loss for guideline purposes and does not address restitution at all. The formula for determining the value of collateral for restitution purposes has already been established by this Court (see Docket No. 133), and it is logical to use the same formula to compute both restitution and guideline loss amounts.

## II. Legal Standards

### A.     Restitution

The Mandatory Victim Restitution Act requires courts to order defendants to make full restitution to victims in a wire fraud case. *See* 18 U.S.C. § 3663A(a)(1) and (c)(1)(A)(ii); *United States v. Havens,* 424 F.3d 535, 537 (7th Cir. 2005) (restitution mandatory for defendant convicted of wire fraud and other offenses in connection with obtaining a fraudulent loan using the identity of another person). The Seventh Circuit reviews a district court's calculation of restitution for an abuse of discretion. *Id.* at 538.

The term "victim" means a person directly and proximately harmed as a result of the commission of the offense and includes "in the case of an offense that involves as an element a scheme . . . any person directly harmed by the defendant's criminal conduct in the course of the scheme . . . ." 18 U.S.C. § 3663A(a)(2). Therefore, although the Defendant has been convicted of only one count in this case, this Court should order her to make restitution in connection with all of the loans she processed (all loans

2

except the one described in Count Seven).

Restitution is mandatory unless "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." §3663A(c)(3)(B). As discussed below, in many cases the victims have neither claimed the right to restitution nor computed any loss despite requests for that information.[1]

In loan fraud cases, restitution amounts are generally computed by subtracting the value of the collateral (typically the property itself) from the outstanding loan principal. *See* 18 U.S.C. § 3663A(b)(1)(B)(i)(II); *United States v. Cage,* 365 Fed. Appx. 684, * 5 (7th Cir. 2010) (unpublished), *citing United States v. Allen,* 529 F.3d 390, 396 (7th Cir. 2008). Although prejudgment interest is properly included in a restitution award, *United States v. Shepard,* 269 F.3d 884, 886 (7th Cir. 2001), it is excluded from loss amount under the guidelines pursuant to Guideline §2B1.1 comment. (n. 3*(D)(i)*).

**B.    Loss Amount**

Loss amounts are to be determined on the basis of: (1) "all acts and omissions committed, aided, abetted . . . or willfully caused by the defendant;" and (2) "in the case of jointly undertaken criminal activity . . ., all reasonably foreseeable acts and

---

[1] The government has issued 30 subpoenas for documents, has conducted numerous interviews, and has reviewed voluminous public records in an effort to determine loss and restitution amounts. Since the original lenders are now out of business, in most cases the government's efforts have been met with indifference on the part of the victim and successor victim institutions.

omissions of others in furtherance of the jointly undertaken criminal activity;" and (3) "all harm that resulted from the acts and omissions" previously specified. Guideline §1B1.3(a)(1). A plain reading of §1B1.3 and its commentary makes clear that it is the defendant's *co-defendants* or *joint venturers'* conduct that must be foreseeable to the defendant, not the conduct of the victims that must be foreseeable. To the extent that the defendant argues that *the victims'* conduct in buying and reselling the properties was not foreseeable to her, and that such conduct was not in furtherance of the scheme, the argument makes no sense. She is accountable for the harm she and her co-defendants caused to the victims, regardless of whether the victims' subsequent efforts to minimize the harm she did to them was foreseeable to her or was in furtherance of the scheme. *Of course* the victims' later efforts to recoup their losses were not in furtherance of the defendant's scheme.

"Loss" for guideline purposes means the greater of actual loss or intended loss. Guideline §2B1.1(b)(1), comment. (n. 3(*A*)). "'Actual loss' means the reasonably foreseeable harm that resulted from the offense, while "'Intended loss' *(I)* means the pecuniary harm that was intended to result from the offense; and *(II)* includes intended pecuniary harm that would have been impossible or unlikely to occur." *Id.* at n. 3*(A)(i) and (ii)*. The government has used the "actual loss" in all of its calculations except for the calculation associated with 6828 South Indiana (discussed below).

A court only need make a reasonable estimate of the loss, and its determination is entitled to deference. Guideline §2B1.1 comment. (n. 3©)); *United States v. Peel,* 595

F.3d 763, 773 (7th Cir. 2010). "A defendant who challenges a district court's loss calculation carries a heavy burden, for he must show that the calculation was not only inaccurate, but also outside the realm of possible computation." *United States v. Barnhart*, 599 F.3d 737, 748 (7th Cir. 2010) (internal citation omitted). In loan fraud cases, loss amounts are computed by subtracting the value of the collateral (typically the property itself) from the outstanding loan principal. *See* §2B1.1 comment. (n. *3(E)(ii)*); *United States v. Helfand*, 281 Fed. Appx. 551, 555 (7th Cir. 2008); *United States v. Lane*, 323 F.3d 568, 590 (7th Cir. 2003).

## III. Loss and Restitution Amounts in This Case

### A. Scope of the Defendant's Participation in the Fraud

The defendant takes issue with the government's "expansive application of the relevant conduct guideline to the facts in her case." p. 4. The government's view of relevant conduct is supported by statements of the defendant herself. In her written plea declaration, the defendant admitted that she, "participated in a scheme to defraud mortgage lenders by making materially false representations supporting documentation to mortgage applications." (Docket No. 91, p. 2). She specifically admitted that in March 2006 she caused to be created and submitted to a mortgage lender a false Verification of Rent ("VOR") in connection with "Al Spann's" purchase of 3834 West Maypole Avenue, Unit 3, Chicago, Illinois (Count One). In an interview with agents of the FBI on March 24, 2008, she admitted that she had caused the creation of the VOR for this loan in that she asked an acquaintance (called "GA" for the

5

purposes of this pleading) to create the document for her. During that interview, one of many she had with government agents, she admitted that she had also caused GA to create false VORS in connection with the loans charged in Counts Two, Five and Nine of the indictment.[2] During the an interview on March 31, 2008, she explained in detail how she participated in the processing of each loan charged in the indictment (with the exception of the loan charged in Count Seven), and has acknowledged receiving four separate payments from Beck, totaling $20,300, between May 3, 2006, and August 9, 2006, for her work on processing the loans. The first check for $10,000 was for facilitating the loans for the three condo units at 3824 West Maypole. The second check for $3,800 was for facilitating the loan for Beck's own purchase of 3849-51 West Maypole. The remaining two checks were in the amount of $3,500 and $3,000.

The relevant conduct provision of the guidelines tells us *whose* acts or omissions will be attributed to the defendant – either her own, or her co-schemers' if the offense involves jointly undertaken criminal activity as this case does. It tells us *which properties* the defendant will be responsible for – those properties implicated in the fraud committed by her or by her co-schemers. The relevant conduct provision does *not* tell what those losses are. To answer that question, we use the analysis from the previous section. The defendant suggests that in order to be held accountable for losses

---

[2] FBI agents interviewed GA on May 13, 2008, and he admitted that he had created the VORs for the defendant, and that he had also created false pay stubs and W-2 forms for her. Those false documents purported to show that the defendant was an employee of a business called "Speedy Redi Mix" and that she earned approximately $100,000 per year at that company. This issue will be discussed in more detail below.

6

for these properties, the government must show that the *subsequent sales by the victims* (as opposed to the fraudulent conduct itself) must be foreseeable to her *and* that those sales must be in furtherance of the scheme. That is incorrect. The *fraudulent conduct* must be foreseeable to her, either because it was her own conduct (as is the case here) or because it was her co-schemer's conduct (which is also the case here). The *fraudulent conduct* must be in furtherance of the scheme. A crime victim (in this case a successor mortgage lender) who buys a property at a foreclosure sale, either from another party or from "itself," is trying to make a profit or mitigate its loss. That conduct is separate from the criminal's act of fraud, and it is a mistake to believe that the victim's conduct has to be foreseeable to the defendant, and be in furtherance of the defendant's fraud, in order for the relevant conduct provision to apply.

**B.     Loss Attributable to the Defendant**

The defendant reads too much into *United States v. Radziszeswki,* 474 F.3d 480 (7th Cir. 2007). She maintains that the case establishes a "foreclosure-proceeds formula" to be used in fraudulent loan cases. In *Radziszeswki,* the Seventh Circuit began by affirming that district courts need only make a "reasonable estimate" of loss, and that their loss calculations are due a degree of deference." *Id.* at 486. The Court then went on to hold that it was not clearly erroneous for the district court in that case to consider the value of the property to be the price at which it sold at a foreclosure sale. *Id.* at 487. That is a far cry from saying that the case established a "foreclosure-proceeds formula." We do not know whether in that case the entity that bought the

foreclosed property was the same entity that had made the loan (which was often the case here), or whether the property was then sold on the open market at all.

Other defendants in this case have argued that the foreclosure sale price should be used to establish the value of the property, while the government has argued that the property value should be determined by the price at which the bank later sold the price to a third party (not the price at which the lender essentially bought the property back from itself). On September 15, 2010, this Court ruled that the government's methodology was appropriate and used the government's formula to ascertain restitution due *in connection with two of the very same properties at issue in defendant Parker's case*: 3834 W. Maypole Avenue, Unit 1, and 3817 West Maypole (Docket No. 133). The government's reasons for advancing its view are restated below.

The defendant argues that the "deficiency" calculated in the state court foreclosure action should dictate the restitution amount in this federal criminal case. That is not correct. Bids by foreclosure plaintiffs such as this one are often called "credit bids." Plaintiffs who are forced into foreclosure proceedings by the borrower's default are in a difficult situation. If they bid too low, for example $20,000, then they run the risk that someone else will bid $21,000 and potentially become the owner of the plaintiff's only collateral for an already impaired loan. If the plaintiff bids too high, for example the full value of the loan, then the borrower will allege that there is no loss at all because the "value" of the collateral is equal to the amount of the loan. In practice, lending institutions that are forced into foreclosure proceedings by the wrongdoing of others typically bid in accordance with internal policies developed by

8

management.  Here is an example.

    *SMFC Funding Corp. v. United Financial Mortgage Corp.*, 24 F. Supp.2d 858 (N.D. Ill. 1998) involved a civil suit in which the purchaser of a bad mortgage loan filed suit against the seller of the loan when the purchaser discovered that the loan was obtained by fraud.  The loan went into default and foreclosure.  The purchaser/foreclosure plaintiff SMFC claimed its loss was the unpaid principal balance of the loan (approximately $123,000 plus other amounts the government does not seek in this case), less the proceeds it realized from the sale of the property (approximately $13,000).  This is the formula used by the government in this case.  In *SMFC,* the defendant argued that the loan balance should be reduced by the "credit bid" – the amount of money that the foreclosure plaintiff paid for the property in the proceeding ($90,000) – not by the actual sale price.  Crediting SMFC's explanation for why it bid 85% of the appraised value of the property, Judge Marovich agreed with SMFC and stated that the actual sales price should be used. *Id.* at 863.  This was because SMFC had relied on a bogus appraisal in its business dealings and loss computations, and using the "credit bid" would result in a windfall to the seller of the bad loan.  Such is the case here.  In *SMFC,* the plaintiff explained that the reason it typically bid 85% of a property's original appraised value was to avoid being accused of underbidding the property at the foreclosure sale, and thereby improperly inflating the deficiency amount charged to the borrower, which would render SMFC vulnerable to attack from the buyer that its bid was not made in good faith.  *Id.* at 862, n. 6.

9

In the case of 3834 West Maypole, Unit 1 (used as an example in the defendant's objections), if Bank of New York had bid lower than $169,957.50, it could have been accused of acting in bad faith by creating an improperly inflated deficiency, and it easily could have been outbid by others. Its high bid is now being used as evidence that it is due *less* restitution. This is not equitable and is not the result contemplated by the Mandatory Victim Restitution Act or the case law. Crime victims are not required to mitigate damages. *United States v. Rice,* 38 F.3d 1536, 1542 (9th Cir. 1994) (rejecting defendant's claim that the victim's poor organization and inefficient practices contributed to its own loss such that the defendant's restitution obligation should be reduced). *See also United States v. Rhodes,* 330 F.3d 949, 953 (7th Cir. 2003) (rejecting defendant's claim that his employer's investment losses, incurred in order to make the defendant's victims whole, should not be attributable to the defendant); *United States v. Suarez,* 253 F. Supp.2d 662, 663 (S.D.N.Y. 2003) (rejecting defendant's claim that victim's inadequate training or insufficient supervision of its employees contributed to its own loss such that the defendant's restitution obligation should be reduced). This Court should use the government's methodology and consider the value of the property to be that which was established by the sale price determined in the open market.

In summary, the defendant's loss calculations are incorrect because they use the value of the "credit bid" rather than the actual sales price as the measure of property value, and because they would have this Court mistakenly require that the *victims' own conduct* be foreseeable to the defendant and in furtherance of the scheme. Also,

10

her calculations simply ignore the loss associated with co-defendant Beck's purchase of 2023 North Bingham (Count 6), and the losses to the actual Kevin Kelley.

## C.    Loss Associated With 6828 South Indiana

The defendant asserts that, "the full value of the 6828 S. Indiana mortgage should be credited against the total loss calculation because that outstanding mortgage was fully satisfied prior to sentencing." p. 14. It is true that this building was damaged by fire during the pendency of the foreclosure proceeding, and that the lender received an insurance payment. The government concedes that it is not clear whether the lender was made whole in this case, but does not concede that there was no actual loss at all. But recall that "loss" for guideline purposes means the greater of actual loss or intended loss, and that "intended loss' means the pecuniary harm that was intended to result from the offense. Intended loss applies to this property.

The defendant admitted to FBI agents on March 31, 2008, that she contacted co-defendant Beck to find a buyer for this property which was owned by her mother-in-law. The defendant stated that Beck arranged for co-defendant Kevin Keller (who was posing as Kevin Kelley) to purchase the property – the same person for whom the defendant had already processed two other mortgage loans within the previous few months. The defendant admitted that she obtained a false VOR for Keller/Kelley to use to purchase this property. Given these circumstances, and the circumstances of the other fraudulent loans she had processed while working with Beck earlier that year, it was foreseeable to the defendant that this was a fraudulent mortgage transaction and that Keller/Kelley would default on the loan causing a loss to the lender (as he had

in fact done with the other two properties). The defendant should not receive a windfall simply because, following the filing of the inevitable foreclosure proceeding, the building caught fire and the lender received some insurance proceeds. Finally, even if the loss associated with this property is completely disregarded, the loss still exceeds $1 million and the guideline range in the PSR is unaffected.

## IV. The Defendant's Mitigation Argument

There is no dispute that the defendant has led a very difficult life. But her conduct *in this case* is not excused by those difficulties. By the time the defendant engaged in the fraud charged in the indictment, she was a well-educated woman with a graduate degree and no criminal history. She was not "forced" into committing fraud in order to provide for her children. Moreover, as noted in the PSR, she had engaged in mortgage fraud both before and after the conduct charged in the indictment.

In 2004, two years before the events charged in the indictment, the defendant applied for a loan to purchase 6827 South Indiana in Chicago. She falsified her income and residence information on the loan application and related paperwork and provided the lender with false pay stubs, W-2 forms, and a false VOR. The loan was approved and the lender disbursed funds, although the loan was later repaid and the lender suffered no loss.

In December 2006, around the same time she first started dealing with the FBI about the fraudulent Beck-related loans, the defendant applied for a loan to refinance her own home. In the application, she falsely stated that she worked at a company

called Speedy Redi Mix where she earned $9,000 per month. The defendant was actually employed by M&R Mortgage Solutions and did not earn the income she stated to the lender. The lender detected fraud and did not fund the loan.

In September and October 2007 (during which time she was often being interviewed by the FBI about the 2006 scheme charged in the indictment), the defendant applied for and received a $617,500 loan from Citibank to refinance her own home. In the loan application and supporting documents she falsely stated that she worked at Speedy Redi Mix where she had worked for the previous five years, and that her bank account had a balance of approximately $70,000. In August 2008 the defendant filed Chapter 7 bankruptcy. In a bankruptcy filing on November 7, 2008, creditor Citibank stated that the balance owed on the loan was $499,013.79 and moved for permission to foreclose on the mortgage. The bankruptcy court granted the motion, a foreclosure action was filed, and in October 2009 (while this criminal case was pending) the defendant's home was sold at a judicial sale.

The defendant cannot blame her co-defendants for her fraudulent activities.

## V. Restitution to the Real Kevin Kelley

Kevin Kelley of Alabama is a real victim. As a result of the theft of his identity by Parker's co-defendant Keller, and Keller's use of it to purchase three properties in Chicago, Mr. Kelley has been mired in litigation in Illinois state and federal courts. According to his attorney, John S. Hoff, Mr. Kelley paid **$19,118.08** in legal fees in connection with his defense of six separate Illinois lawsuits arising from the fraudulent

13

mortgage transactions. These fees were not incurred pursuing litigation *against* Keller, the fees were incurred from being *forced to defend himself* against the effects of the defendants' crimes. These fees should be included in the restitution order because the goal of criminal restitution is restoration to the victim of something the defendant has taken. *See United States v. Havens,* 424 F.3d 535, 539 (7th Cir. 2005) ("Fees paid to counsel . . . for dealing with the banks and credit agencies in the effort to correct her credit history [resulting from theft of her identity in a false mortgage scheme] . . . are also properly included in a restitution order."). *See also United States v. Hosking,* 567 F.3d 329, 332 (7th Cir. 2009) (bank's costs of investigating crime against it properly included in restitution award).

Respectfully submitted,
PATRICK J. FITZGERALD
United States Attorney

By:  s/ Clifford C. Histed
     CLIFFORD C. HISTED
     Assistant United States Attorney
     219 South Dearborn, 5th Floor
     Chicago, Illinois 60604
     (312) 886-7627

14

## Table of Loss and Restitution Amounts

| Count | Property / Victim | Loss Amount | Restitution Amount |
|---|---|---|---|
| 1 | 3834 W. Maypole, Unit 3 | $199,702.64 | $0 |
| 2 | 3834 W. Maypole, Unit 2 | $222,284.24 | $44,849.85 |
| 3 | 3834 W. Maypole, Unit 1 | $213,091.27 | $287,208.73 |
| 4 | 3817 W. Maypole | $233,889.54 | $345,190.10 |
| 5 | 3849-51 W. Maypole | $381,662.50 | $0 |
| 6 | 2023 N. Bingham – 1 | $143,459.52 | $0 |
| 7 | 2033 N. Bingham – 2 | N/A to defendant | N/A to defendant |
| 8 | 5243 W. Ohio | $275,889.06 | $305,320.90 |
| 9 | 6828 S. Indiana | $348,111.68 | $0 |
|  | Kevin Kelley | $19,118.08 | $19,118.08 |
|  | **Total:** | **$2,037,208.53** | **$1,001,687.66** |

15

<u>Certificate of Service</u>

The undersigned Assistant United States Attorney hereby certifies that the <u>Government's Response to Defendant Michelle Parker's Objections to the PSR, and to her Sentencing Memorandum</u> was served on November 29, 2010, in accordance with Fed. R. Crim. P. 49, Fed. R. Civ. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

By:  s/ Clifford C. Histed
CLIFFORD C. HISTED
Assistant United States Attorney
219 South Dearborn, 5th Floor
Chicago, Illinois 60604
(312) 886-7627

16